## BROWN *v.* MEMPHIS & C. R. Co.

*(Circuit Court, W. D. Tennessee.* April 25, 1881.)

1. CARRIERS OF PASSENGERS — FEMALE PASSENGER—UNCHASTITY—EXCLUSION FROM LADIES' CAR.

   A railroad company may rightfully exclude from the ladies' car a female passenger whose reputation is so notoriously bad as to furnish reasonable grounds to believe that her conduct will be offensive, or whose demeanor at the time is annoying to other passengers; but she cannot be excluded for unchastity not affecting her conduct, or furnishing reasonable ground to believe she will misbehave herself in the car, when her demeanor at the time was lady-like and unexceptionable. The charge of the court in this case (5 FED. REP. 499) re-affirmed on motion for a new trial.

2. REASONABLE REGULATION—MIXED QUESTION OF LAW AND FACT.

   It is not error for the court, in charging the jury, to say that a given regulation is unreasonable, when the court explains to the jury what what would be the rules of law by which the reasonableness or unreasonableness is to be tested, and leaves to the jury the determination of the facts of the particular case. The ruling in this case on demurrer (4 FED. REP. 37) explained and applied.

3. DAMAGES — COMPENSATORY AND PUNITIVE — ABSENCE OF MALICE— GOOD FAITH IN DISCHARGE OF DUTY.

   It was not error to refuse a charge that the absence of malice on the part of the conductor, and good faith in what he regarded as his duty, would deprive the plaintiff of a right to punitive damages, and reduce her claim to such as are purely compensatory, when the court modified it by adding that such facts, if true, should be taken in mitigation of the punitive damages the jury should see proper to give. The jury may protect the public and enforce the legal duty of a carrier of passengers by inflicting punitive damages, where an unreasonable regulation is insisted on by the carrier, and a *bona fide* belief in the right to enforce the regulation is only a matter of mitigation.

4. CARRIER—WRONGFUL EXCLUSION OF PASSENGER—RIGHT OF RESIST-
ANCE—DAMAGES.

A passenger about to be wrongfully ejected is not bound to sub-
mit without resistance, but it should not be encouraged, as it leads to
affrays and turbulence, and is generally useless where there is a de-
termination to remove the passenger from the train.   But while such
resistance is no defence to the action, if personal injury be inflicted
as a result of it the jury may look to the fact of resistance in mitiga-
tion of damages.

5. SAME SUBJECT—EXCESSIVE VERDICT.

It is the exclusive province of the jury to affix the damages, and
where they are cautioned against excessive verdicts, prejudice, and
passion, the court will not disturb their verdict in a case contain-
ing elements of gross personal indignity and injury.

Motion for New Trial.

*Inge & Chandler,* for plaintiff, cited *Etting* v. *Bank,* 11 Wheat.
75; *Hallaway* v. *Armstrong,* 30 Miss. 504; *Adams* v. *Power,* 48
Miss. 451; *Dorsey* v. *Spirey,* 57 Miss. 527; *Clymer* v. *Cameron,*
55 Miss. 593; *Perry* v. *Clark,* 5 Miss. (How.) 495; *Brantley* v.
*Carter,* 26 Miss.; *Cameron* v. *Watson,* 40 Miss. 191; *Corbin*
v. *Cameron,* 31 Miss. 570; *Hanna* v. *Renfro,* 32· Miss. 125;
*M. & C. R. Co.* v. *Whitfield,* 44 Miss. 266; *Simpson* v. *Bon-
den,* 23 Miss. 524; *Pritchard* v. *Meyers,* 13 Miss. (S. & M.)
532; *Barkins* v. *Winston,* 24 Miss. 431; *Docier* v. *Ellis,* 28
Miss. 720; *Bank* v. *Railroad Co.* 53 Miss. 200; *Abbrighton*
v. *Railroad Co.* 38 Miss. 280; *Hurst* v. *Railroad Co.* 36 Miss.
660; *Bailey* v. *Railroad Co.* 40 Miss. 402; *Garland* v. *Stew-
art,* 2 George, 314; *Gay* v. *Simley,* 3 George, 309; *Harris* v.
*Holliday,* 4 How. (Miss.) 338; *Watson* v. *Dickens,* 12 S. &
M. (Miss.) 608; *Woods* v. *Gibbs,* 6 George, 559; *Storall* v.
*The Bank,* 8 S. & M. (Miss.) 305; *Philbrick* v. *Holloway,* 6
How. (Miss.) 91; *Skinner* v. *Collier,* 4 How. (Miss.) 376;
*Bohn* v. *Steam-boat,* 7 S. & M. 715; *Fox* v. *Williams,* 6 George,
533; *Hand* v. *Grant,* 5 S. & M. 508; *McMullen* v. *Mayo,* 8
S. & M. 278; *Cogan* v. *Frisly,* 7 George, 178; *McGhee* v.
*Harrington,* 13 S. & M. 403; *Atwood* v. *Meridith,* 8 George,
635; *Baringer* v. *Nesbitt,* 1 S. & M. 22; *Drake* v. *Sergent,* 7
S. & M. 458; *Routh* v. *Agricultural, etc.,* 12 S. & M. 161;
*Hare* v. *Sproul,* 2 How. (Miss.) 772; *Rulon* v. *Sintals' Heirs,*

Id. 881; *Garrett* v. *Hickman*, 41 Miss. 94; *Wright* v. *Alexander*, 11 S. & M. 411; *Dean* v. *Young*, 13 S. & M. 113; *Verchum* v. *Byron*, 7 How. (Miss.) 365; *Brantley* v. *Carter*, 4 Cush. 282; *Simpson* v. *Bowden*, 1 C. Page, 526; *Wiggins* v. *McGimpsy*, 13 S. & M. 532; *Hill* v. *Calvin*, 4 How. (Miss.) 231; So. Law Rev. 791, (note;) 1 Greenl. Ev. § 51; Best, Prin. Ev. §§ 61, 64, 65, 229, 249; *Peck* v. *Railroad Co.* 10 N. Y. 587; *McKinney* v. *Railroad Co.* 44 Iowa, 314; *Marquett* v. *Railroad Co.* 33 Iowa, 562; Thomp. on Carriage of Passengers, 302; *Railroad Co.* v. *Vallely*, 32 Ohio, 315; *Murphy* v. *Railroad Co.* 118 Mass. 228; *Haley* v. *Railroad Co.* 21 Iowa, 15; Hutchinson on Carriers, 473; 5 So. Law Rev. (N. S.) 777; 10 Cent. L. J. 41; 9 Cent. L. J. 208; *Moore* v. *Railroad Co.* 4 Gray, 465; *Holmes* v. *Wakefield*, 12 Allen, 580; *Goss* v. *Goss*, 3 Humph. 278; *Pettit* v. *Pettit*, 4 Humph. 191; *Busby* v. *Smith*, 3 Humph. 406; *Law* v. *Railroad Co.* 32 Iowa, 534; *Ross* v. *Railway*, 36 Wise. 450; *Healing* v. *Railroad Co.* 28 Ohio, 23; *Railroad Co.* v. *Vandiver*, 42 Pa. 365; *Kline* v. *Railroad*, 37 Cal. 400; *Putnam* v. *Railroad Co.* 55 N. Y. 103; *Williamson* v. *Railroad Co.* 66 N. Y. 642; *Day* v. *Owen*, 5 Mich. 520; *Applewhite* v. *Allen*, 8 Humph. 697; *David* v. *Bell*, Peck, 135; *Brison* v. *Amitta*, Peck, 194; *Railroad Co.* v. *Williams*, 55 Ill. 185.

*Humes & Poston*, for defendant, cited Angell on Carriers, 525; Thompson on Carriers, 10, 14, 316, 317; Hilliard on New Trials, 384; 3 Graham & Waterman, New Trials, 1063; *Jenks* v. *Coleman*, 2 Sumn. 221; *Neits* v. *Clark*, 1 Cliff. 149; *Thurston* v. *Railroad Co.* 4 Dillon, 321; *Seymour* v. *Railroad Co.* Biss. 146; *Ferry-boat* v. *Gregory*, 2 Ben. 239; *Day* v. *Woodward*, 13 How. 371; *Railroad Co.* v. *Quigley*, 21 How. —; *Deane* v. *Pearson*, 4 Wall. 605; *Railroad Co.* v. *Owens*, 91 U. S. 492; *Telegraph Co.* v. *Eyser*, Id. 495; *Hall* v. *De Cuir*, 95 U. S. 502; *Commonwealth* v. *Power*, 7 Mets. 596; *Venton* v. *Railroad Co.* 11 Allen, 104; *Gardner* v. *Mitchell*, 6 Pick. 115; *Markham* v. *Brown*, 8 N. H. 523; *Bennett* v. *Dutton*, 10 N. H. 481; *Railroad Co.* v. *Mills*, 55 Pa. St. 211; *State* v. *Overton*, 4 Zab. 441; *Railroad Co.* v. *Ayres*, 29 N. J. Law, 395; *Day* v. *Owen*, 5 Mich. 520; *Boss* v. *Railroad Co.*

36 Wis. 450; *Barray* v. *Steam-boat*, 67 N. Y. 301; *Jackson* v. *Hook*, 5 Cow. 208; *Jackson* v. *Crosby*, 12 John. 354; *Stephens* v. *Smith*, 29 Vt. 153; *Barker* v. *French*, 18 Vt. 460; *Briggs* v. *Gleason*, 27 Vt. 116; *Railroad Co.* v. *Vandyne*, 57 Ind. 576; *Railroad Co.* v. *Anthony*, 43 Ind. 188; *Railroad Co.* v. *Blotcher*, 27 Md. 286; *Travers* v. *Railroad Co.* 63 Mo. 423; *Lillis* v. *Railroad Co.* 64 Mo. 476; *Railroad Co.* v. *Burke*, 53 Miss. 200; *Railroad Co.* v. *Cole*, 29 Ohio. St. 126; *Levitsky* v. *Johnson*, 35 Cal. 43; *Aldrich* v. *Howard*, 7 R. I. 87; *Heaton* v. *Fire Ins. Co.* Id. 508; *Martin* v. *Ehrenfels*, 24 Ill. 189; *Palace Car Co.* 75 Ill. 126; *Watts* v. *Johnston*, 4 Texas, 319; *Waller* v. *Graves*, 20 Conn. 311; *Snowman* v. *Wardwell*, 32 Me. 276; *Turnley* v. *Evans*, 3 Humph. 223; *Sharp* v. *Treece*, 1 Heisk. 447.

The plaintiff, a colored woman, recovered a judgment against the defendant corporation for $3,000 for a wrongful exclusion from the "ladies' car" of one of the defendant's passenger trains. A statement of the defences set up, and the rulings of the court on the demurrer, will be found reported in 4 FED. REP. 37, and a synopsis of the charge of the court on the main question involved is reported in 5 FED. REP. 499. Besides the exception to the charge as there found, the defendant assigned four other grounds for a new trial, as follows:

(1) "That the court, in its charge, substantially said to the jury: That such a regulation was unreasonable; for, that it makes the irresponsible conductors of passenger trains the censors of the virtue of the women of the country, as they would necessarily have to pass upon the chastity or unchastity of the mothers and wives and daughters of the country, and might exclude one and allow the other to pass, as it suited their caprices.

(2) "The court erred in refusing to give the fifth instruction asked by defendant, in the following language: 'If the jury find, from the proofs, that the conductor, in excluding the plaintiff from the ladies' car, acted in good faith, in discharge of what he regarded as his duty, and not maliciously, or wantonly, or with unnecessary rudeness, although he may have

been mistaken in his duty and violated the rights of the plaintiff, yet she would not be entitled to recover punitive, exemplary, or vindictive damages, but such as are purely compensatory.' But the court refused to give the instruction as requested, and charged 'that such facts should be taken in mitigation of such punitive, exemplary, or vindictive damages as you may think proper to give.'

(3) "The court erred in refusing the sixth instruction of defendant, as follows: 'If the jury find, from the testimony, that the conductor was discharging his lawful duty in requiring plaintiff to leave the ladies' car, and, in attempting to overcome her resistance, injured her, then the burden of proof that he used unnecessary force and violence is on the plaintiff to satisfy the jury, by a clear preponderance of testimony, that the conductor did use such unnecessary force and violence; and if the counter-testimony of defendant, as detailed by Hall and Stone, preponderates over that of plaintiff and her witnesses, in the opinion of the jury, then they must find for the defendant.'

(4) "Again, we insist that the new testimony discovered after the trial (the witness White) is sufficient to grant a new trial, as the court can easily see that another credible witness, supporting Governor Stone and Hall, as to the alleged choking of the plaintiff, would, in all probability, have limited the recovery to compensatory damage against the defendant. The testimony was discovered only accidentally after the trial, and by no human agency, or reasonable or extraordinary diligence, could it have been discovered earlier."

The affidavits of newly-discovered testimony show that one White was in the car at the time, and he details the occurrences in a way tending to corroborate the defendant's witnesses. It is said the fact that this witness was present was not discovered until after the trial of the case. The facts not already shown by the previous reports of this case appear in the opinion of the court. It should be stated that the plea which justified the exclusion, on account of color, was withdrawn because this company makes no distinction on that account, and the reasonableness of any regulation

based on color was, therefore, not passed upon by the court *Vide* 4 FED. REP. 37, 38.

HAMMOND, D. J.   This case is again before me on a motion for a new trial, and I have been aided by lengthy oral arguments, and an elaborate printed brief for defendant of unusual earnestness and exhaustive research.   It is conceded by the learned counsel for defendant that "in all cases of exclusion for any reason we have not found a single case of a woman, but that on account of color, in *Railroad Co.* v. *Williams*, 55 Ill. 185, and *Railroad Co.* v. *Miles*, 55 Pa. St. 209," to which may be added *Railroad Co.* v. *Brown*, 17 Wall. 445, and other cases not necessary to cite.   This statement accords with my own researches, for when this case was before me on demurrer I endeavored diligently to discover if the defence set up in the special plea in this case had ever before been made.   The reason is plain.   Thieves, rioters, gamblers, drunkards, or otherwise disorderly persons are not generally women, nor while traveling do women often misbehave, our own sex being substantially monopolists of these vices; nor are they generally engaged in any calling which can be used to the detriment of the carrier's business, by using his means of transportation to solicit patronage for a rival line, as in *Jencks* v. *Coleman*, 2 Sumn. 221, the leading case on this subject; and it is for this reason that carriers, acting upon the notions of chivalry that, with all its vices, characterize our sex, seek to protect women from the rude conduct of the disorderly by providing for them a special "ladies' car," in which, while traveling alone, they may be somewhat secluded.   And, in my judgment, this case of *Jencks* v. *Coleman* has been often misapplied, as it has been in argument here, during which its language was repeatedly quoted with constant reiteration of emphasis.   In delivering his opinion in the case, Mr. Justice Story uses language which, interpreted in the light of the facts he was considering, and of the facts of subsequent cases that have followed it properly in judgment, contains the enunciation of a principle that has become established law. But when he speaks of the *character* and *conduct* of passengers "who are guilty of gross and vulgar habits of conduct, or

who make disturbances on board, or whose characters are doubtful or dissolute or suspicious, and, *a fortiori*, whose characters are unequivocally bad," he means character, habits, and conduct that are injurious to the other passengers in the sense that it subjects them to loss at the hands of the thief or gambler, to discomfort by reason of personal trespass and insult, or to annoyance by the exhibition of gross and vulgar habits. He does not mean that the common carrier, in the interest of the public, or its own supposed interest, shall become a censor of individual morals by assuming to classify his passengers according to his own idea, more or less fastidious, of their character or conduct, as established by their private lives. The carrier has nothing whatever to do with private character or conduct, except so far as it furnishes him with evidence of a probable injury about to be inflicted on his other passengers or his business. He must carry all who come properly dressed, and who behave genteelly, and cannot classify them according to their general moral reputations, though he may exclude those who are at the time inflicting injury and annoyance, or who have so unequivocally bad reputations for some vice that tends to injure and annoy the passengers, that he has reasonable grounds to assume that they will, if permitted to remain, put the vice in practice; nor need he wait for an overt act. It is easy enough to imagine the case of a dissolute man or woman so abandoned to habits of unchastity that either would, in a railroad car, give just offence by lascivious solicitations, the exhibition of indelicate manners, or the use of improper language; and a reputation for such conduct would justify exclusion. This is the issue made by the special plea here, and the one submitted to the jury, and found against the defendant corporation under a charge almost identical with the language of this opinion on that point.

The difficulty in this case arises from the fact that the defendant was not willing to confine the issue to that of the special plea, which alleged that the plaintiff was a notorious courtesan, addicted to the use of profane and indecent language in public places, and of gross and vulgar

habits of conduct, (*vide* 4 FEDERAL REPORTER 38,) and which, if the jury had found to be true, would have been a good defence; but insists that, on the facts as proved, and under the general issue, it was entitled to a verdict, and should now have a new trial, because the court did not adopt that view. I cannot better present the principle upon which we were asked to try the case than by extracting it from the brief of defendant's counsel. "We submit," say they, "that nothing could be more repulsive and annoying to ladies, and their fathers, husbands, and brothers, than to know that whores will be entitled to be seated by them in railroad cars;" and again, "Why establish or maintain a 'ladies' car' at all, if whores, and all other classes of improper characters, can get admittance there, and their exclusion therefrom can only be justified from bad conduct at the time?" This position was defended and illustrated by the argument *ad hominem* before the jury, and to the court, with great vehemence, and is not without some force. Passing the question whether the jury on the facts would so designate this plaintiff, the argument, in my opinion, is as wholly unsound as if applied to prevent the characters described from walking on the same street with "ladies." Nor do I see why it should not be applied to men as well as women, so as to exclude whoremongers, not only from the "ladies'" car, but from that in which "gentlemen" ride. But the experience of every man who travels demonstrates that, as a fact, no such classification is attempted; and the proof was satisfactory that this company does not adopt it, and no regulation was proved that especially authorized it. The conductor testified that he was instructed to keep out improper characters, which he considered would exclude prostitutes; but defendant was challenged by plaintiff's counsel to prove a single instance in which a woman had ever been excluded from their ladies' car for want of a reputation for virtue at home, and no such instance was offered, except the exclusion of this plaintiff twice before by this same conductor. On the other hand, the plaintiff proved that she had frequently traveled in the "ladies' car" on this road with other conductors, and had never been excluded

except by this one; and that women known to be prostitutes had traveled in such cars without objection, and that this conductor had been seen talking familiarly in the ladies' car with white women known in the town where plaintiff lived, and all along the road, as belonging to the denounced class. The conductor denied all knowledge of this, and it may be that he did not know it; but it is strange that more exclusions, by himself or other conductors, were not shown, if it was the habit of the company to so classify the passengers. It was proved that the car in which this plaintiff was ordered to ride was filled with "virtuous ladies, wives, mothers, and daughters, and their husbands and fathers;" and yet this woman, notwithstanding the pretended regulation, was to be placed "in contact" with them. It is true, they were "emigrants," but none the less entitled to protection at the hands of the carrier; and while they might have sought protection in the "ladies' car," as suggested in the argument, they would have had to pay first-class fare, as this plaintiff did, to be so entitled. The truth is, this whole defence is based upon a strained construction of the word "ladies," as applied to "ladies' car," used in the parlance of railroad people.

In *Bass* v. *Railroad Co.* 36 Wis. 450, a male passenger was forcibly ejected from a car, and the defence was "that the car into which the plaintiff entered was a 'ladies' car,' set apart by a regulation of the company for ladies and for gentlemen accompanying ladies, as plaintiff knew;" and the court, in justifying this regulation, does say that "even women, or men accompanying women of offensive character or habits, may be excluded, so as to group women of good character on the train together, sheltered as far as practicable from annoyance and insult." This is the nearest approach to any judicial sanction for the argument under consideration I have found. Passing the fact that it is *obiter*, the language quoted, like that of *Jencks* v. *Coleman*, must be understood to apply only to cases "where it can be satisfactorily proved [to use the words of the learned chief justice in *Venton* v. *Railroad Co.* 11 Allen, 304] that the condition or conduct of a person was such as to render it reasonably certain that he would occa-

sion disturbance or annoyance to other passengers if he was admitted into a public vehicle or allowed longer to remain within it." This case was expulsion from a street railroad car, where the plaintiff was intoxicated, and used loud, boisterous, profane, and indecent language. So it is with all the cases cited by defendant; not a single one goes upon any other ground than that there must be, either existing or apprehended, some injurious, offensive, or otherwise annoying conduct of the person excluded; and the mere presence of persons of immoral character in a public car, where the immorality is of the kind alleged in this case, and is confined to the private life of the individual, and does not affect her habits and conduct in public places, is no more a sufficient ground for exclusion than their presence in the streets, horsecars, omnibuses, or other such vehicles would be. Any other rule would prohibit them from traveling altogether, for they may as well be excluded from these last as from the railroad cars. Indeed, the American style of railway carriages is incompatible with any such classification of passengers; the cars are constructed to seat not less than 60 persons, and when virtuous ladies travel in such conveyances they need not and do not expect to find that seclusion which is possible in social life at home, at hotels, and places of amusement. The "ladies' car" is not designated alone for women whose virtue is above reproach, but for those whose habits and behaviour are modest, genteel, and irreproachable, while traveling alone or with male companions of like habits; and in it these may find some seclusion from the sometimes boisterous and rough ways of men traveling without the restraints of female society, but not seclusion from the presence of other women whose private lives, perhaps, are not what they should be, although their public demeanor is chaste and modest.

The plaintiff in this case proved indisputably, I think, that she is not repulsive in appearance; is accustomed to dress well and even handsomely; behaves in a lady-like manner, and that on this occasion her conduct was unexceptionable. The defendant offered some proof of isolated occasions which might impeach her of unlady-like behavior, but the proof was

clearly inadequate to fasten upon her the imputation contained in the plea that she was "addicted to lascivious and profane conversation and immodest deportment in public places." The conductor, it is said, swore that she was talking through the window to two "low-down men," and when he ordered her out she said, "I'll be derned if I do;" and it is urged that she did not contradict this in her proof. The court does not remember whether she specifically contradicted the conductor or not, but the proof was all submitted to the jury, the witnesses were before them, and they were the judges of the facts. She proved that at weddings, parties, pic-nics, and all manner of social gatherings, among the most refined and elegant women of Corinth, she was employed to serve refreshments and wait upon the "virtuous ladies, wives, mothers, and daughters, and their husbands and fathers," and to nurse them in sickness. If this be so (and there is not the least doubt of it) where she and her reputation are best known, it is difficult to see how her presence in a "ladies' car" could be offensive to entire strangers, or even to those to whom she was known at home. On this occasion she sat in one end of the car alone, two or three other women being in the other end, the remaining passengers being men without female companions, among them the governor of the state, who testified to her good behavior then and at all other times in public.

On proof like this I do not see how the jury could have found otherwise than a wrongful exclusion, except upon the theory already discussed that the mere presence of an unchaste or "kept woman," as she was called by certain witnesses and some of the counsel, is a sufficient justification for exclusion from this particular car in which otherwise she was entitled to ride, and an obligation on her to ride in another car, assigned not to women of her class particularly, but which was offensive to her because smoking was allowed in it, and because it was crowded with passengers traveling at lower rates than she paid, and that, too, while she had, according to contract, the right to as pure air and as good accommodations as other women traveling on a first-class ticket.

The most careful consideration of the case fails to procure the assent of my judgment to such a doctrine, not only for the reason already stated, but for another mentioned in the charge to the jury, that such a regulation would practically place the character of every woman, virtuous or not, for trial before every railroad conductor, and the reputation of her private life might be at any time called in question by him. The argument that the conductor and railroad company act at their peril, and are liable in damages for mistakes in judgment, does not remove this difficulty. It is inadequate redress for such a wrong as that of saying to a virtuous woman that she must ride in another car because not believed to be chaste enough to ride in the "ladies' car," set apart for virtuous ladies. It is an unreasonable regulation, and finds not a single case to justify it, that a conductor shall undertake to classify his passengers according to their moral character or want of it, when their manner, dress, and habits of conduct are not offensive.

Another objection to the charge is that the court took away from the jury this question of reasonable regulation, and did not follow the ruling on the demurrer. 4 FED. REP. 37. But neither that ruling nor the authorities on which it is based warrant the assumption that the jury are to be the sole judges of the question of reasonableness. They are, as in all mixed questions of law and fact, to apply the facts of the particular case to the principles of law laid down by the court. I charged substantially in the manner indicated in *Commonwealth* v. *Powers*, 7 Met. 603, and did not in the least encroach upon the duties of the jury. It will be found upon a critical examination that the only reason the court cannot, as a matter of law, determine the question whether the regulation is reasonable, is because the plea does not in sufficient detail display the facts which must control the judgment of the court. Given undisputed facts, and the question of reasonableness is one of pure law.

The next objection is that the court refused to charge the jury that absence of malice on the part of the conductor, and good faith in the belief that he was acting rea-

sonably, would entitle the plaintiff to recover only compensatory, and not punitive damages, and charged that such a state of facts would only go to mitigate the damages. There is, on the facts of this case, no room, perhaps, to say unqualifiedly that the conductor acted without malice, and there is proof tending to establish at least wantonness of conduct; and the rule is well settled that the company is responsible for wilful injuries by conductors acting under a pretence of performing a duty or carrying out orders. Pierce on Railroads, 279. But assuming that he did act without malice, the charge seems to me to be correct. There is, undoubtedly, a class of cases where malice or gross negligence, showing a reckless indifference to the rights of others, is necessary to entitle the plaintiff to exemplary damages. *Milwaukee R. Co.* v. *Arms*, 91 U. S. 492; *Phila. R. Co.* v. *Quigley*, 21 How. 213; *Day* v. *Woodworth*, 13 How. 369. But this does not always mean simply the personal malice of the conductor or agent of the corporation. Where that exists, or his conduct is "wanton, gross, and outrageous, and in the nature of a personal indignity," vindictive damages are allowed; but, in its absence, punitive damages may be inflicted as a method of enforcing upon the corporation obedience to the duties required of it as a common carrier, even in cases where no personal spite can be possible. The only way carriers of passengers ·can be held to reasonable regulations is by allowing juries to inflict punitive damages for a violation of the rights of the public; and the establishment of unreasonable regulations is the gravamen of the offence, that being a disregard of the rights of the public for which the carrier is punished. The mere price of a ticket, or refunding of the money, will not answer the purpose in all cases; that would be simply to permit the carrier to enforce the unreasonable regulation, because he should never claim to keep the money while refusing to render the service. He would take no money or refund all received, and go on with his business in his own way, and the plaintiff, or the public, would be no better off. ·This rule of damages would be simply rescinding the contract of carriage, which is all the carrier demands,

and sufficient for his purpose.    Even in *Pearson* v. *Duane*,
4 Wall. 605, so much relied on, where the captain put off
his passenger from a humane motive, to save his life, and the
jury gave $4,000, which the supreme court, because of the
mitigation, reduced to $50, the damages were punitive and
not compensatory, as it was not shown that plaintiff had
been damaged in fact one cent.    He had paid for no ticket,
and had no money of his own, and clearly the $50 was
allowed to enforce the judgment that the exclusion was tech-
nically wrongful, and not to compensate the plaintiff.

In *Railroad* v. *Brown*, 17 Wall. 446, a colored woman ex-
cluded from a car on account of her color "with force, and,
as she alleged, with some insult," recovered $1,500 damages,
and it was not even assigned for error that the damages
should have been only compensatory, and the court affirmed
the judgment.    The true rule will be found to be, I think,
that in all cases where the offence is against the particular
individual, the want of malice only mitigates the punishment
in damages, and may reduce them to zero, according to cir-
cumstances.    But, where the offence is not only against a
particular individual, but also against the public, as in most,
if not all the cases of wrongful exclusion of passengers, the
question is one solely for the jury to say how much punish-
ment is necessary to enforce the rights of the public against
the carrier, as well as to vindicate the private individual.
The defendant here had all the benefit of the principle relied
on when the jury were told that the facts, if true, should be
taken in mitigation of such punitive damages as they should
think proper to give.

The other instruction refused was clearly asking the court
to charge upon the weight of the testimony of Stone and Hall.
The court charged the jury fully as to the method of weigh-
ing testimony, and cautioned them against supposing it con-
sisted in merely counting the witnesses.    It also instructed
them that the burden of showing violence was on the plain-
tiff, and that it was her duty to confine her resistance within
the point of contributing to her injuries by engaging in an
unnecessary trial of strength with superior force.    The cases

of *Bass* v. *R. Co. supra,* and *Lillis* v. *R. Co.* 64 Mo. 464, cited by counsel to sustain the statement that "passengers on railroads have no right to resist ejection, although unlawful, and that they must submit and seek redress elsewhere," do not sustain the position. In the first, the court hold that the passenger could not forcibly enter the ladies' car after being forbidden, although, under the circumstances, he had a right to go there; but it does not hold that, being already in, he could not forcibly resist unlawful ejection. In the other case the court simply rules that, if the conductor had a right to put him off, the passenger could not resist; and all the cases cited seem to place the duty of submission on the ground that the command to leave the conveyance is rightful. How far a passenger, in defence of his right to remain, may carry his resistance, may be doubtful; but absolute submission is not his duty by any means, and lawful resistance does not preclude the right of recovery. The proof here showed that the plaintiff refused to leave, and, when the conductor laid hands on her, she fastened her feet about the rungs of the seat, and defendant contended that in overcoming this unlawful resistance to the authority of the conductor the injury, if any, was done, and that he could lawfully use all force necessary to overcome it. The cases do not show that the conductor can lawfully employ any force to remove one rightfully in the car, and whatever is used is wrongful; even where the expulsion is rightful the force must not be excessive, and where it is wrongful reasonable resistance cannot be unlawful. Still, the conductor has authority to determine whom he will eject, and can command force generally sufficient to accomplish the removal, so that resistance of any kind, except enough to show that the wrong is not acquiesced in by the plaintiff, is useless where the conductor is determined on ejecting the passenger. Besides, resistance in some cases would lead to affrays or other turbulence, and be a disturbance of other passengers. I think, therefore, no rule should be adopted which would encourage it. Such resistance is no defence to the action, but where personal injuries are received I am of the opinion that unnecessary

resistance may be considered as mitigating the damages, where, but for the resistance, no injury would have been inflicted. Hutch. Car. § 593; Thomp. Car. Pass. 374; *English* v. *Canal Co.* 66 N. Y. 454. There was a count in this declaration for using unnecessary violence, and, as to that cause of action, if the expulsion had been rightful there was a necessity to charge the jury that the conductor might use reasonable and necessary force to eject the passenger; but if the jury came to the conclusion that the expulsion was unlawful, then the principles here enunciated would govern the case, and the charge given allowed the jury to look at the fact of resistance as mitigating damages for an injury sustained on account of it. There was no error in refusing the charge as written, in any possible view of the rights of the parties, and that given by the court was more favorable on this point to the defendant than the authorities cited would perhaps justify, because they seem to recognize an unqualified right of resistance to wrongful expulsion.

The newly-discovered evidence of White is only cumulative, and while it would have been useful, perhaps, to defendant, no sufficient ground is shown for not having produced it. The conductor should have taken down the names of persons present, and the fact that the presence of one other witness in the car has been discovered since the trial is immaterial, as it was then known to the conductor that this and other persons were present.

The only remaining question is as to the amount of this verdict. If I had been on the jury I should have been content with a somewhat smaller sum than $3,000; but it is a question for the jury, and not the court, to say what is necessary in a case like this. Thomp. Car. Pass. 576. In reviewing the verdict on a motion for a new trial it must appear that it is the result of passion, prejudice, or undue influence, and while it is the duty of the court to protect the defendant against such influences by setting aside excessive verdicts, it should not invade the province of the jury. Counsel, on the one hand, cited many cases showing large verdicts sustained; and, on the other, cases showing very small ver-

dicts and excessive ones set aside. The court charged the jury that they must not give an excessive verdict, and must be careful not to allow any prejudice against railroads, or any passion engendered by the facts of the case, to mislead their judgment; and, on the other hand, to do the plaintiff and the public justice, if they found the expulsion wrongful, by inflicting such damages as in their judgment would correct the evil. It was a case where prejudice against corporations (if any such existed) was set against prejudice on account of color and social degradation by reason of an alleged want of chastity; and counsel on either side were not backward in invoking these supposed prejudices, while the court tried to eliminate both from the minds of the jury, composed entirely of white men of the very highest character and intelligence. The proof of the plaintiff, if true, showed a very brutal assault upon her. She exhibited her dislocated thumb to the jury, and proved by unimpeachable witnesses, who saw her immediately afterwards, that she had on the back of her neck abrasions caused by severe choking. One witness swore to seeing the choking through the car window, and the plaintiff certainly complained of it and her other injuries to the superintendent of the road, who happened to be at the station, and who promised to investigate the matter. On the other hand, Governor Stone, who was present in the car, says he saw no such violence, and that if it had occurred he must have seen it, while the conductor denies all choking and injury to her thumb. The theory of the defendant is that these injuries were fabricated for the occasion. The testimony of the disinterested witnesses may be, and no doubt was, by the jury, reconciled upon the ground that the governor was mistaken in saying that the injuries could not have been inflicted without his seeing it. The conductor agreed that he had to use force enough to lift her from the seat around which she had clasped her feet, and he described how he had accomplished it without choking; but he might have done the injury without Governor Stone having seen it. However this may have been, the jury weighed all the testimony, and they were the tribunal to reconcile it or determine where the truth lay, and

the court cannot undertake to say that they should have decided otherwise. Their attention was called to the conflict of testimony, and they were told what were the rules of law for weighing and testing it; they had the benefit of thorough argument by able lawyers, witness was contrasted with witness, and circumstance with circumstance, and, under a proper charge, they have determined the fact. I cannot disturb their verdict.

There is another ground, irrespective of the foregoing, on which this verdict should probably be sustained, as insisted by plaintiff, which is that having sold this woman a ticket by an agent who swears he knew all about her and her character, and she having acquired a seat in the ladies' car, none other of equal accommodation being furnished, the defendant could not, in the absence of bad conduct at the time, exercise any right to refuse to carry her in that car on account of general bad reputation. But it is unnecessary to examine this subject critically, since I have reached a conclusion on the other points that would lead to the same result if this doctrine should be ruled in plaintiff's favor. I prefer to place my judgment upon the grounds that were so earnestly argued, and to fairly decide upon the defence which, if valid, would have protected the company under the most favorable view of the case that could be taken in its behalf.

The motion for a new trial is overruled.